**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TERRIER MEDIA BUYER, INC.,
d/b/a COX MEDIA GROUP,

                 Plaintiff,

     v.

DISH NETWORK L.L.C.,

                Defendant.

No. 1:20-cv-00583

Hon. Thomas M. Durkin

**TERRIER MEDIA BUYER, INC.'S OPPOSITION TO
DISH'S MOTION TO DISMISS AMENDED COMPLAINT**

Scott Lassar (No. 1586270)
Bruce R. Braun (No. 6206628)
Hille R. Sheppard (No. 6226077)
John M. Skakun III (No. 6297636)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
slassar@sidley.com
bbraun@sidley.com
hsheppard@sidley.com
jskakun@sidley.com

*Counsel for Terrier Media Buyer, Inc.*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................... 3

    A.   Statutory And Regulatory Framework............................................................ 3

    B.   The Contract Dispute. ........................................................................................ 4

    C.   DISH's Willful Copyright Infringement......................................................... 7

ARGUMENT ........................................................................................................................ 7

    I.    The State Court TRO Does Not Provide A Basis To Dismiss The Complaint.............. 7

    II.   Willful Infringement Is Not A "Claim" To Be Dismissed On The Pleadings. ............. 12

    III.  DISH's Argument About The Statutory Copyright License Is Nonsense. ................... 14

CONCLUSION.................................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Cases**                                                       **Page(s)**

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008).................................................14

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
   398 U.S. 281 (1970)...................................................................11

*Bell v. Chi. Cubs Baseball Club, LLC*,
   2020 WL 550605 (N.D. Ill. Feb. 4, 2020) ................................12

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
   394 U.S. 369 (1969)...................................................................11

*Blagman v. Apple Inc.*,
   2013 WL 2181709 (S.D.N.Y. May 20, 2013) ..........................12

*Broad. Music, Inc. v. CDZ, Inc.*,
   724 F. Supp. 2d 930 (C.D. Ill. 2010) .......................................12

*Chi-Boy Music v. Charlie Club, Inc.*,
   930 F.2d 1224 (7th Cir. 1991) ..................................................12

*Doe v. Duncanville Indep. Sch. Dist.*,
   994 F.2d 160 (5th Cir. 1993) ....................................................11

*Donovan v. City of Dallas*,
   377 U.S. 408 (1964) ..................................................................11

*Fed. Deposit Ins., Corp. v. FBOP Corp.*,
   252 F. Supp. 3d 664 (N.D. Ill. 2017) .......................................11

*Gallo v. Moen Inc.*,
   813 F.3d 265 (6th Cir. 2016) ....................................................10

*Gen. Atomic Co. v. Felter*,
   434 U.S. 12 (1977) (per curiam).................................................11

*Hirsch v. Complex Media, Inc.*,
   2018 WL 6985227 (S.D.N.Y. Dec. 10, 2018) ...........................7

*Johnson v. Bellwood Sch. Dist. 88*,
   2016 WL 3476660 (N.D. Ill. June 27, 2016).............................15

*Muhammad-Ali v. Final Call, Inc.*,
   832 F.3d 755 (7th Cir. 2016) ......................................................7

*Nw. Steel & Wire Co. v. Indus. Comm'n*,
  627 N.E.2d 71 (Ill. App. Ct. 1993) ..................................................................11

*Primus v. McKenna*,
  2015 IL App (1st) 133713-U (Ill. App. Ct. 2015) ............................................9

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ..........................................................................14

*Subsalve USA Corp. v. Watson Mfg., Inc.*,
  462 F.3d 41 (1st Cir. 2006)................................................................................9

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ...........................................................................13

*Vienna Beef, Ltd. v. Red Hot Chi., Inc.*,
  833 F. Supp. 2d 870 (N.D. Ill. 2011) ...............................................................11

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001)..........................................................................................10

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994) .............................................................................13

*Zurich Am. Ins. Co. v. Super. Ct. for State of Cal.*,
  205 F. Supp. 2d 964 (N.D. Ill.), *rev'd on other grounds*, 47 F. App'x 417 (7th
  Cir. 2002) ...........................................................................................................9

**Statutes**

17 U.S.C. § 101 ......................................................................................................3

17 U.S.C. § 106 ......................................................................................................3

17 U.S.C. § 106(4) .................................................................................................3

17 U.S.C. § 119(d)(6) .............................................................................................3

17 U.S.C. § 122............................................................................................3, 4, 14, 15

17 U.S.C. § 122(a)(1)........................................................................................3, 15

17 U.S.C. § 122(a)(1)(B) .......................................................................................3

17 U.S.C. § 122(d) ....................................................................................3, 14, 15

17 U.S.C. § 122(f)(2) ............................................................................................15

17 U.S.C. § 504(c)(2).............................................................................................12

iii

47 U.S.C. § 325(b) ..........................................................................................................4

**Rules, Regulations, and Orders**

47 C.F.R. § 76.64 ............................................................................................................4

47 C.F.R. § 76.64(a) .....................................................................................................4, 14

47 C.F.R. § 76.64(j) ......................................................................................................4, 14

*In re Implementation of the Cable Television Consumer Prot. & Competition Act
   of 1992 Broadcast Signal Carriage Issues,*
   8 FCC Rcd. 2965 (1993) ...........................................................................................4

## INTRODUCTION

As this Court knows from the related contract case pending before it, *DISH Network L.L.C. v. Cox Media Group, LLC*, No. 20-cv-00570 ("*DISH I*"), DISH and Terrier disagree whether the retransmission consent agreement ("RCA") DISH negotiated with the previous owners of the 13 legacy "Cox stations" was terminated in accordance with its terms. (*See DISH I*, Dkts. 95 ("DISH PI Br."), 109 ("Terrier PI Opp.").) Terrier maintains that the "Cox RCA" terminated on December 17, 2019, when those stations were brought under common ownership with the legacy "Northwest stations" – an outcome that, according to DISH's internal documents, DISH expected. This copyright infringement action seeks damages for DISH's continued unauthorized retransmission of the Cox stations' broadcast TV signals.

DISH has moved to dismiss this copyright claim, but *not* because DISH maintains it will prevail in the contract lawsuit and prove that it actually does still have retransmission consent under a governing RCA. Instead, DISH moves to dismiss based on a TRO obtained in state court. DISH is attempting to use the TRO in an unprecedented fashion. Although DISH has repeatedly claimed it needs the TRO to protect its customers from the harms of the stations "going dark," its motion to dismiss lays bare its true objective: DISH believes the TRO gives it legal cover to continue the unauthorized retransmission of the Cox stations' signals without the risk of having to pay copyright damages if it ultimately loses the contract case. This incredible proposition is supported by neither the language of the TRO nor any applicable authority.

First, the TRO expressly provides that it "does not prevent any Defendant from asserting a right to monetary relief for copyright infringement," and the order declares that it takes "no position as to the effect of this [TRO] in any such copyright infringement lawsuit, including one asserting any claim for damages based on a finding of infringement during the period of the [TRO]." (Dkt. 21-2, 1/24/20 TRO ¶ 5.) DISH's reading of the TRO erases that portion of the

TRO, contrary to the legal rules governing the construction of court orders.

Second, DISH's motion treats the TRO as having irrevocably altered the parties' substantive rights for the period the TRO was in effect. As DISH would have it, the TRO locks in an extension of DISH's right to retransmit the Cox stations' signals at the rates reflected in the Cox RCA. But TROs do not alter substantive rights; they merely maintain the status quo while the substantive rights of the parties are determined. Nothing in the language of the TRO or the general rules governing TROs supports DISH's view that the order stripped Terrier of its federal right to pursue a remedy for copyright infringement for DISH's unauthorized retransmission of its stations' signals. The TRO prohibits Terrier (and the other defendants in the contract case) from interfering with retransmission of the Cox stations' signals, but it does not immunize DISH from the consequences of being wrong about its contractual rights.

DISH's fallback arguments also should be rejected. DISH contends that, at a minimum, the TRO precludes a finding of willful infringement. But willfulness is a question of fact that should not be decided at the motion-to-dismiss stage. Plus, there is ample reason to infer that DISH's infringement is willful: DISH is of course aware of the explicit language in the TRO permitting copyright damages, and Terrier has repeatedly warned DISH in writing that continued unauthorized retransmission would be a willful violation of the Copyright Act. Moreover, DISH is an experienced player in the industry whose entire litigation strategy is predicated on the understanding that, if it retransmits without consent, it is liable for copyright damages.

DISH also baldly asserts that, even if it does not have consent to retransmit, it may benefit from the Copyright Act's statutory license. This is nonsense that ignores the clear statutory and regulatory framework. DISH does not even bother to point to any language in the statute to support its argument. DISH's motion to dismiss should be denied.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Statutory And Regulatory Framework.

The Copyright Act grants copyright owners several "exclusive rights to do and to authorize" particular uses of their works. 17 U.S.C. § 106. One of these exclusive rights is, "in the case of . . . audiovisual works, to perform the copyrighted work publicly." *Id.* § 106(4). This is known as the exclusive right of public performance. The exclusive right of public performance includes the right to retransmit a broadcast signal containing a copyrighted work. *Id.* § 101.

The Copyright Act defines direct-to-home satellite providers like DISH, which capture and retransmit copyrighted works embedded in broadcast signals, as "satellite carrier[s]." *Id.* § 119(d)(6). Section 122, added to the Copyright Act by Congress as part of the Satellite Home Viewer Improvement Act of 1999, establishes a statutory license under which satellite carriers are authorized to retransmit, and thereby publicly perform, copyrighted programming embedded in a station's signal "into the station's local market" if certain requirements are met. *Id.* § 122(a)(1). As relevant here, satellite carriers must comply "with the rules, regulations, or authorizations of the Federal Communications Commission governing the carriage of television broadcast station signals." *Id.* § 122(a)(1)(B).[1]

Importantly for this case, subsection (d) of Section 122 provides that, "[n]otwithstanding" the license granted in subsection (a), if a satellite carrier retransmits local TV broadcast signals without consent in violation of the FCC's "rules, regulations, and authorizations . . . concerning the carriage of television broadcast signals," it commits "an act of infringement under section 501, and is fully subject to the remedies provided under sections 502 through 506." *Id.* § 122(d).

---

[1] DISH bizarrely states that the original complaint "did not even cite the statutory copyright license of 17 U.S.C. § 122" and committed "an enormous legal blunder" by ignoring that provision. (DISH MTD Br. 1–2, 7.) But Section 122 was cited repeatedly, and the statutory license's dependence on compliance with the FCC's rules, including retransmission consent, was explained. (*See* Dkt. 1, Complaint ¶¶ 10, 18, 35.)

In other words, if a satellite carrier does not comply with the FCC's rules, it cannot make use of the Section 122 license.

Section 122's incorporation of the FCC's rules means copyright liability turns on whether satellite carriers have retransmission consent. This is because Section 76.64 of the FCC's rules (promulgated under the Communications Act) require multichannel video programming distributors ("MVPDs") such as DISH to secure broadcasters' written consent in order to lawfully retransmit the broadcasters' signals. 47 C.F.R. § 76.64(a); 47 U.S.C. § 325(b).[2] Consent is typically negotiated for and provided in exchange for a fee, and memorialized in an RCA between the MVPD and the owner of the station. *See* 47 C.F.R. § 76.64(j). This concept of retransmission consent – and in particular the resulting ability of broadcasters to demand payment for retransmission of copyrighted programming embedded in their signals – was a core feature of the Cable Television Consumer Protection and Competition Act of 1992 and represented Congress's deliberate choice "to establish a marketplace for the disposition of the rights to retransmit broadcast signals." *In re Implementation of the Cable Television Consumer Prot. & Competition Act of 1992 Broadcast Signal Carriage Issues*, 8 FCC Rcd. 2965, 3005 (1993) (quoting Senate Report at 36).

**B.**     **The Contract Dispute.**

As set forth in the Terrier Defendants' preliminary injunction briefing in the contract case (*DISH I*, Dkt. 109), DISH entered into an RCA authorizing retransmission of the Cox stations' signals on March 31, 2019. That RCA provided for a termination date three years later, but also

---

[2] DISH observes that Terrier has not pleaded a violation of the Communications Act. (DISH MTD Br. 2, 14–15.) That is irrelevant. Terrier *does* allege a violation of Section 122 of the *Copyright Act* (not of the Communications Act, as DISH mistakenly wrote in its motion to dismiss (DISH MTD Br. 10)), and Section 122 expressly incorporates the FCC's rules.

expressly contemplated the possibility of an early termination. The parties here and in the related contract case dispute whether early termination occurred as a result of the transactions that brought the Cox and the Northwest stations under common ownership on December 17, 2019. As the preliminary injunction briefing makes clear, DISH expressly contemplated when it signed the Cox RCA in March 2019 that such early termination likely would happen and that DISH's continued retransmission of the Cox stations' signals would be governed by another RCA (the "Northwest RCA") when the change in ownership occurred. (*DISH I*, Dkt. 109 at 8–10, 16.)

The parties engaged in negotiations regarding a new RCA that would govern all of the stations that became governed by the Northwest RCA – including the Cox stations – after the transactions. The parties agreed to multiple extensions of the Northwest RCA. (Dkt. 35, Amended Complaint ("AC") ¶ 26.) The last extension expired at 7:00 p.m. Eastern Time on January 18, 2020. (*Id.*) When that extension expired, DISH no longer had consent to retransmit the signals of the Cox or Northwest broadcast TV stations. (*Id.*) DISH stopped retransmitting the signals of the Northwest stations but continued to retransmit the signals of the Cox stations.

DISH ran to state court on January 15, 2020, three days before the last extension expired. (*Id.* ¶ 27.) It filed the contract action now pending before this Court, which covers only the Cox stations. DISH also sought an *ex parte* TRO, emphasizing the harm to its customers if "the television screens of hundreds of thousands of DISH customers go dark," and asking the state court "to maintain the *status quo* . . . so that DISH may continue to retransmit [the Cox stations] to its customers during the course of this litigation." (Ex. A, DISH TRO Br. 3.) At an *ex parte* hearing on January 15,[3] the state court entered a TRO enjoining the defendants in the contract

---

[3] DISH continues to claim it "informed Cox and its affiliates of the hearing, but they did not appear." (DISH MTD Br. 5–6.) As previously explained in the contract case, this is misleading. DISH did not

case from "prohibiting [DISH] from retransmitting" the Cox stations' signals. (AC ¶ 27.)

The state court held additional hearings on January 21 and 24, 2020, after Terrier and the other defendants appeared. (AC ¶ 28.) At the January 21 hearing, the state judge explained that "the reason for the issuance of the TRO [on January 15] was that I was worried not so much about [DISH's] rights . . . as much as the over one million subscribers to [DISH's] services and their inability to get and access a signal. That was the basis of the TRO." (Dkt. 21-8, 1/21/20 Hr'g Tr. 6:18–7:1.)[4] At the January 24 hearing, DISH again claimed it needed a TRO to protect its customers, arguing that "hundreds of thousands of people" would lose access to the Cox stations, including for the Super Bowl, if the TRO was not extended. (Dkt. 21-9, 1/24/20 Hr'g Tr. 11:12–24.) But DISH also repeatedly acknowledged that, if its contract claim was wrong on the merits, it would be liable for copyright infringement, including enhanced statutory damages for willful infringement, for retransmitting the Cox stations' signals without consent. (*E.g.*, *id.* at 16–17.) Although the state court decided to extend the TRO, it specifically recognized that the TRO should not interfere with Terrier's ability to seek redress for copyright infringement during the pendency of the TRO if its position on the contract ultimately prevailed. (*Id.* at 34–35, 68.)

The TRO states in paragraph 2 that the Cox RCA remains "in full force and effect." (Dkt. 21-2, 1/24/20 TRO ¶ 2.) But the order goes beyond that vague generality when speaking directly and specifically about the TRO's potential effect on a copyright infringement lawsuit. Paragraph 5 states that it "does not prevent any Defendant [including Terrier] from asserting a right to monetary relief for copyright infringement," and declares that the court took "no position as to the effect of this [TRO] in any such copyright infringement lawsuit, including one asserting any

---

inform any of the defendants in that case of the location of the TRO hearing or of the time it would begin until *two minutes into the hearing*. (*DISH I*, Dkt. 47 at 12 (citing record evidence).)

[4] For citations to the state court transcripts, pin cites are to the internal pagination, not ECF page numbers.

claim for damages based on a finding of infringement during the period of the [TRO]." (*Id.* ¶ 5.)

Terrier removed the contract case. It filed this copyright infringement case the same day.

### C.  DISH's Willful Copyright Infringement.

DISH has continued to retransmit the signals of the Cox stations after the expiration of Terrier's retransmission consent on January 18, 2020. (AC ¶ 31.) On January 24, Terrier sent a letter to DISH confirming that any and all retransmission of the Cox stations' signals after 7:00 p.m. Eastern Time on January 18 is a knowing and willful infringement of the copyrighted programming embedded in these signals. (AC Ex. 2.) Since then, pursuant to Section 411 of the Copyright Act, Terrier has sent advance notices to DISH regarding its willful infringement of the copyrighted programming embedded in the Cox stations' signals. (*See, e.g.*, AC Ex. 3.)

### ARGUMENT

### I.  The State Court TRO Does Not Provide A Basis To Dismiss The Complaint.

DISH does not dispute that Terrier adequately alleged the only two elements of a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016). Instead, DISH focuses almost entirely on arguing it has authorization to retransmit the copyrighted work embedded in the Cox stations' signals because "DISH obtained the necessary consent under the Cox [RCA]" and "the TRO prohibits Terrier from withdrawing consent." (DISH MTD Br. 9–11.) But, as DISH acknowledges, authorization is an affirmative defense, and the burden is therefore on DISH to show that dismissal is appropriate based on the face of the TRO. *Muhammad-Ali*, 832 F.3d at 760–61; *accord Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, at *9 (S.D.N.Y. Dec. 10, 2018) ("[Plaintiff] need not establish at the pleading stage that the copying was unauthorized."). DISH has not carried its burden.

The TRO does not prevent Terrier from seeking or recovering copyright damages –

including for the period of time the TRO was in place – if, as Terrier alleges in its copyright

complaint and argues in the contract case, the Cox RCA terminated as a result of the Northwest

and Cox transactions. The TRO expressly states:

> This Order does not prevent any Defendant from asserting a right to monetary relief for copyright infringement or Plaintiff from asserting any defenses thereto. The Court takes no position as to the effect of this [TRO] in any such copyright infringement lawsuit, including one asserting any claim for damages based on a finding of infringement during the period of the [TRO].

(Dkt. 21-2, 1/24/20 TRO ¶ 5.)

DISH seeks to erase this paragraph by claiming it does not prohibit Terrier from *filing* a

copyright infringement lawsuit, but does prevent Terrier from *arguing* that "DISH lacks Terrier's

retransmission consent." (DISH MTD Br. 12.) As DISH would have it, the order takes "no

position" on a copyright infringement lawsuit "asserting any claim for damages . . . *during the

period of the Temporary Restraining Order*" (emphasis added), but it nonetheless prevents

Terrier from making an argument *essential* to obtaining those very damages. That is nonsense.

DISH's motion pretends as if it has no obligation to make any sense of paragraph 5 of the

TRO or give it any discernible effect. Instead, DISH talks repeatedly about language in

paragraph 2. But that paragraph imposes a non-interference rule, not a coerced-consent rule. It

temporarily enjoins the defendants in the contract case "*from taking any action to interfere* with

performance of the [Cox RCA], which will remain in full force and effect until further order of

this Court." (Dkt. 21-2, 1/24/20 TRO ¶ 2 (emphasis added).) And, in particular, it enjoins the

defendants "from (i) *prohibiting* [DISH] from retransmitting the Cox stations . . . and/or (ii)

*otherwise interfering* with [DISH's] right to transmit those stations." (*Id.* (emphasis added).) It

does not say anything about forcing the defendants to *consent* to retransmission, and neither does

it address a copyright lawsuit that seeks damages for infringement while the TRO is in place.

DISH puts all its weight on the generic phrase "full force and effect." (DISH MTD Br.

11.) But courts construe judicial orders using the same interpretive tools used to construe statutes and contracts. *Zurich Am. Ins. Co. v. Super. Ct. for State of Cal.*, 205 F. Supp. 2d 964, 968 (N.D. Ill.), *rev'd on other grounds*, 47 F. App'x 417 (7th Cir. 2002); *Primus v. McKenna*, 2015 IL App (1st) 133713-U, ¶ 34 (Ill. App. Ct. 2015). Courts read orders to avoid self-contradiction, *Subsalve USA Corp. v. Watson Mfg., Inc.*, 462 F.3d 41, 45 (1st Cir. 2006), and one way to do that is for the specific provision to control when a general provision could be read to require the contrary, *Zurich*, 205 F. Supp. 2d at 968. Here, paragraph 5 specifically addressed – and allowed – this very copyright infringement lawsuit, whereas paragraph 2 is at best general. To the extent paragraph 2 is specific at all, it is specific to potential acts of interference; its language was driven by the state court's (unfounded) concern that Terrier could force the stations to "go dark" by shutting off their signals and has nothing to do with copyright infringement damages. Further, if paragraph 2 were read to address copyright damages, it would render paragraph 5 superfluous, which is to be avoided. *See Subsalve*, 462 F.3d at 45 (judicial orders "should be read as a whole," "all words and provisions . . . should be given effect," and "constructions that would render words or phrases meaningless, redundant, or superfluous should be avoided." (cleaned up)).

Moreover, DISH's suggestion that the state court, through this generic language in paragraph 2, intended to irrevocably extend the Cox RCA during the life of the TRO, thereby *forcing* Terrier into consenting to retransmission and *stripping* Terrier of its right to recover copyright damages, is implausible (particularly in light of the contradictory language in paragraph 5). Had the state judge intended such an extraordinary implication of the TRO, one would expect him to have used more specific language than the generic phrase "full force and effect," which was merely a vestige of language from DISH's initial proposed order submitted to the state court on January 15, 2020. (*Compare* Dkt. 21-2, 1/24/20 TRO ¶ 2, *with* Ex. B, 1/15/20

TRO ¶ 2.) To borrow an analogy from the statutory interpretation context, there is no reason to believe the state court intended to hide an elephant in a mousehole. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001); *see also Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) (applying principle to contract interpretation).

Not only is DISH's view inconsistent with general principles governing the interpretation of court orders, it also is refuted by the record. The contract case defendants explicitly asked the state judge to clarify that he was *not* intending to enter an order that would prevent them from recovering copyright damages during the pendency of the TRO. The state judge agreed:

> MR. LASSAR: Can the order specify that it is not the purpose of the order to restrain the defendants from seeking copyright damages that occurred at any time since – if we're correct, since the contract expired?
>
> THE COURT: Yes, the order can reflect that and will reflect that. I'm not trying to prevent the defendants from having access to the federal courts or to this court in the counterclaim, which by the way, I will say parenthetically, I can handle. But that's up to you. So there you go. Yes, it may, of course, say that.

(Dkt. 21-9, 1/24/20 Hr'g Tr. 68:4–15.). Earlier at that same hearing, the state judge made clear he never intended to strip any of the defendants of their right to pursue copyright damages:

> MR. LASSAR: I think they also think that the other reason they want this Court to enter into this dispute, besides helping them on the leverage, is that they want to take the downside away from a decision to keep retransmitting, because as they say, there could be these copyright damages. I don't think, Judge, that you intended in your TRO to say to the defendants, "You don't have a right to go to federal court and say, 'copyright damages.'" I don't think you intended that –
>
> THE COURT: You can be assured I didn't say that, and I would never – I don't think it's enforceable to begin with, and I would never suggest that. You can do what you want.

(*Id.* 34:16–35:5.). And when the state judge asked Terrier's counsel about the harm to Terrier if the TRO were to be extended, Terrier's counsel responded: "*Given that the Court did not intend to stop us from taking copyright damages*, then I think the leverage is the main harm." (*Id.* 35:19–21 (emphasis added).) The state judge did not push back, and indeed entered the TRO

with the language discussed above that expressly allowed this copyright suit.[5]

DISH's interpretation of the TRO is also contrary to the law regarding what TROs may – and may *not* – accomplish. TROs are designed to preserve the status quo; they are not intended to deprive one party of its substantive legal rights (here, a right to copyright damages) while the parties litigate their dispute. *See, e.g.*, *Vienna Beef, Ltd. v. Red Hot Chi., Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011); *Nw. Steel & Wire Co. v. Indus. Comm'n*, 627 N.E.2d 71, 74 (Ill. App. Ct. 1993). Further, to interpret the TRO in the way DISH suggests would allow a state court to exempt DISH from obligations under federal law and to override Terrier's federal rights, which is not permissible. *See Gen. Atomic Co. v. Felter*, 434 U.S. 12, 18–19 (1977) (per curiam) ("The right to pursue federal remedies and take advantage of federal procedures and defenses in federal actions may no[t] . . . be restricted by a state court . . . ."); *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964) (a "right was granted by Congress and cannot be taken away by the State"); *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 392–93 (1969) (state court could not enjoin conduct protected by federal labor laws); *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 284 (1970) (*Jacksonville* held that "a federally protected right . . . could not be interfered with by state court injunctions"). This Court should not interpret the TRO in a way that is contrary to the law regarding TROs or the requirements of federal law. *See Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166–67 (5th Cir. 1993) (construing a preliminary injunction order "as a whole" to avoid an interpretation contrary to Supreme Court precedent); *cf. Fed. Deposit Ins., Corp. v. FBOP Corp.*, 252 F. Supp. 3d 664, 690 (N.D. Ill.

---

[5] Contrary to DISH's suggestion (DISH MTD Br. 13), the state court's commentary at the January 28 hearing is not to the contrary. The state judge simply stated that his TRO remained operative even after Terrier removed the contract case. (Dkt. 37-3, 1/28/20 Hr'g Tr. 5:5–12.) He did not indicate that he believed Terrier violated the TRO by filing the copyright lawsuit; this lawsuit was not even mentioned.

2017) ("[A]n interpretation which renders a contract lawful is preferred over one which renders it unlawful.").

Accepting DISH's interpretation of the TRO would have dramatic implications. If DISH can invoke equity to shield it from copyright damages while it litigates whether it is violating federal copyright law, another court could invoke equity to shield a party from treble damages while the party litigates whether it is violating federal antitrust law or any other federal statute that imposes enhanced damages, on the theory that such damages are too heavy a burden for the defendant to risk being wrong. (*Cf.* Ex. C, DISH TRO Reply 9 ("An adverse finding in a copyright infringement lawsuit . . . presents a substantial and untenable risk of damages to DISH . . . .").) Such a precedent has nothing to recommend it.

## II.     Willful Infringement Is Not A "Claim" To Be Dismissed On The Pleadings.

DISH's first fallback argument is that, even if the infringement claim is not dismissed, Terrier has failed "to state a viable claim of willfulness." (DISH MTD Br. 13–14.) But "willfulness is not a required element of any of [plaintiff's] claims and, therefore, . . . is not a proper ground for a motion to dismiss." *Bell v. Chi. Cubs Baseball Club, LLC*, 2020 WL 550605, at *6 (N.D. Ill. Feb. 4, 2020); *see also Blagman v. Apple Inc.*, 2013 WL 2181709, at *4 (S.D.N.Y. May 20, 2013) ("The contention that [plaintiff] has not established willfulness is irrelevant at [the motion-to-dismiss stage] since willfulness may be demonstrated any time before trial . . . ."). Rather, willfulness is a factual finding that must be made before awarding enhanced statutory damages under 17 U.S.C. § 504(c)(2). *See Broad. Music, Inc. v. CDZ, Inc.*, 724 F. Supp. 2d 930, 935 (C.D. Ill. 2010) (citing *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1227 (7th Cir. 1991)). DISH unsurprisingly fails to cite a single case to the contrary. Accordingly, DISH's argument is premature.

In any event, there is a reasonable basis to believe that DISH's copyright infringement

was and continues to be willful. DISH knew it no longer had consent to retransmit the Cox stations' signals after the January 18, 2020, extension deadline expired. (AC ¶¶ 26, 35.) Terrier sent a letter to DISH about its willful infringement on January 24, 2020, and since then, has regularly sent DISH additional advance notices. (*Id.* ¶¶ 32–33.) DISH repeatedly acknowledged in state court that it would be liable for willful-infringement damages if its interpretation of the contract were incorrect. (*Id.* ¶ 35; *see, e.g.*, Ex. A, DISH TRO Br. 13; Ex. C, DISH TRO Reply 3, 9.) And DISH knew that the TRO expressly said that Terrier could file this copyright lawsuit and that the state court took no position on copyright damages. This is abundant evidence of willfulness. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 512 (7th Cir. 1994) (willfulness under the Copyright Act is a question of fact, and "[e]vidence that notice ha[s] been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness"; "[a] letter informing the defendant of possible infringement clearly provides notice").

None of this should be controversial. DISH is an experienced player in this industry, knows the rules of retransmission consent, and knows the consequences of retransmission without consent. That is why DISH's only response is that its infringement cannot possibly be willful because it relied on the state court's TRO. (DISH MTD Br. 13–14.) But, as discussed above, the TRO expressly does not protect DISH. Nor could this argument succeed on a motion to dismiss anyway. Willfulness is a question of fact, and the impact of the state court's TRO on DISH's mental state is at best something that will eventually need to be considered in the context of all the evidence. It is not a reason to dismiss Terrier's willfulness allegations.[6]

---

[6] The cases cited by DISH (DISH MTD Br. 14 n.8) do not support its position, as none of them holds that a plaintiff failed to adequately allege willfulness on a motion to dismiss, and each is factually distinguishable. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 749 (9th Cir. 2019) (reversing denial of motion for JNOV because, other than sending one notice letter, plaintiff never "raise[d] the specter of

### III.    DISH's Argument About The Statutory Copyright License Is Nonsense.

DISH's second fallback argument is that, even if it retransmitted the Cox stations' signals without consent in violation of the FCC's rules, "until the adjudication of such a violation," it still possesses a statutory license under Section 122 of the Copyright Act. (DISH MTD Br. 2–3, 14–15.) As a threshold matter, DISH's emphasis on the statutory license in subsection (a) of Section 122 is a red herring. Subsection (d) states that, "[*n*]*otwithstanding subsection (a)*," retransmission by a satellite operator in violation of the retransmission consent requirement under the FCC's rules "is actionable as an act of infringement under section 501 [of the Copyright Act], and is fully subject to the remedies provided under sections 502 through 506 [of the Copyright Act]." 17 U.S.C. § 122(d) (emphasis added); *accord* 47 C.F.R. § 76.64(a), (j). DISH cannot obfuscate that this case turns entirely on whether it has consent. (*Cf.* DISH MTD Br. 9 (conceding that the statutory "license is conditioned on compliance with the FCC's rules . . ., including the prohibition on retransmitting a broadcast signal without consent").)

Nor does the rest of DISH's argument hold water. DISH's claim that it cannot commit infringement until after the Court adjudicates retransmission consent makes no sense; taken to its logical conclusion, this position would eviscerate copyright damages in any case where the defendant puts forward an affirmative defense of authorization. Nor is DISH's position supported by any authority. DISH cites nothing, and says only that "[n]o other reading of Section 122 is viable." (*Id.* at 15.) But DISH does not even bother to point to any language from that provision. Nor could it; Section 122 includes no language requiring adjudication of a violation,

---

infringement"); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) (reversing summary judgment willfulness finding because "[t]he plaintiffs [did] not contest the good faith of [defendant's] belief" that he was not infringing); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008) (remanding to district court to reconsider royalty award in patent case, noting the court should have considered sales that, even though authorized by a stay, "were nevertheless infringing").

as opposed to the fact of a violation, before damages may be imposed.[7]

DISH's assertion that allowing copyright damages in this case would lead to "the total loss of DISH's statutory license across the country" is also meritless. (*Id.*; *cf. DISH I*, Dkt. 95 at 22–23 (making similar argument).) Yet again, DISH provides nothing more than its own *ipse dixit*. And Section 122's plain text repeatedly addresses retransmission on a *station-by-station basis*, contrary to DISH's suggestion. In particular, subsection (a) grants a license for "[*a*] secondary transmission" (*i.e.*, a retransmission) "of *a television broadcast station* into *the station's* local market" if, among other things, the retransmission complies with the FCC's rules "governing the carriage of television broadcast station signals." 17 U.S.C. § 122(a)(1) (emphasis added); *see also id.* § 122(d) (addressing copyright damages for retransmission "into the local market of a television broadcast station"); *id.* § 122(f)(2) (specifying that a statutory license under subsection (a) for one broadcast station does not allow retransmission to other local markets, and limiting injunctive relief for a violation to "barring the secondary transmission by the satellite carrier of the primary transmissions *of that television broadcast station*") (emphasis added) (cited in DISH MTD Br. 15). DISH's breach of the retransmission consent requirement *for the Cox stations* thus precludes a statutory license only *for those stations*.[8]

## CONCLUSION

For these reasons, the Court should deny DISH's motion to dismiss.

---

[7] DISH's argument is so undeveloped as to not provide Terrier with fair notice of its basis; it is therefore waived. *See, e.g.*, *Johnson v. Bellwood Sch. Dist. 88*, 2016 WL 3476660, at *6 (N.D. Ill. June 27, 2016).

[8] In yet another distraction, DISH suggests – again without authority – that Terrier should have brought its complaint to the FCC. (DISH MTD Br. 14–15.) But the FCC does not adjudicate copyright claims and there is nothing in either the Copyright Act or the Communications Act that makes filing a retransmission consent complaint with the FCC a predicate for suing for infringement damages in federal court.

Dated: July 16, 2020            Respectfully submitted,

                                       */s/ Hille R. Sheppard*
                                       Scott Lassar (No. 1586270)
                                       Bruce R. Braun (No. 6206628)
                                       Hille R. Sheppard (No. 6226077)
                                       John M. Skakun III (No. 6297636)
                                       SIDLEY AUSTIN LLP
                                       One South Dearborn
                                       Chicago, IL 60603
                                       Telephone: (312) 853-7000
                                       Facsimile: (312) 853-7036
                                       slassar@sidley.com
                                       bbraun@sidley.com
                                       hsheppard@sidley.com
                                       jskakun@sidley.com

                                       *Counsel for Terrier Media Buyer, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2020, I caused the foregoing to be electronically filed

using the CM/ECF system, which will send notice of this filing to all counsel of record.


<u>/s/ Hille R. Sheppard</u>
Hille R. Sheppard (No. 6226077)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
hsheppard@sidley.com

*Counsel for Terrier Media Buyer, Inc.*